UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEBRA ELAINE HANN,

        Plaintiff,

      v.

CAROLYN W. COLVIN,

        Defendant.

Case No. 12-cv-06234-JCS

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 24

## I.    INTRODUCTION

    Debra Elaine Hann ("Hann") seeks judicial review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability benefits. This action is before the Court on the parties' cross-motions for summary judgment.[1] For the reasons explained below, the Court DENIES Hann's motion for summary judgment, GRANTS the Commissioner's cross-motion for summary judgment, and AFFIRMS the decision of the administrative law judge ("ALJ").

## II.    BACKGROUND

### A.    Procedural Background

    On June 26, 2009, Hann concurrently filed applications for disability insurance benefits and supplemental security income for a period of disability beginning April 28, 2006, due to a bulging disc, sciatic pain, a broken foot, and depression. Administrative R. at 82, 87, 164–178 ("AR"). Her applications were denied initially and upon reconsideration. AR at 71–74, 82, 87, 93, 100. The ALJ, Maxine Benmour, reviewed the decision and found that Hann was not disabled in a

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1  decision dated May 26, 2011. AR at 11–26. Hann requested administrative review, and the

2  Appeals Counsel denied this request on October 23, 2012, making the ALJ's decision the final

3  decision of the Commissioner. AR at 1.

4      Hann brought this action pursuant to 42 U.S.C. § 405(g), which gives the Court

5  jurisdiction to review the final decision of the Commissioner. She filed a motion for summary

6  judgment asking the Court to reverse the Commissioner's decision, arguing that the ALJ's

7  decision should be reversed because: (1) Hann is unable to perform any of the alternative work

8  identified by the ALJ; (2) the ALJ failed to articulate specific and legitimate reasons for rejecting

9  the opinion of the treating physician; and (3) the ALJ failed to evaluate properly the opinions of a

10 psychologist, whose opinions the ALJ accorded great weight. Pl.'s Mot. at 3. *See* Pl.'s Mot. for

11 Summ. J. ("Pl.'s Mot."). The Commissioner responded with a cross-motion for summary

12 judgment asking the Court to affirm the ALJ's decision. *See* Def.'s Mot. for Cross-Summ. J.

13 ("Def.'s Mot.").

14    **B.    Factual Background**

15      Hann was born on April 11, 1961 in Santa Rosa, California. AR at 171, 403. She is

16 married and lives with her husband in Petaluma, California. AR at 1, 403, 729.

17        **1.    Chronic pain: Dr. Chin, Dr. Desouza, and Dr. Pang's evaluations**

18             *a.    Dr. Chin's initial examination in 2007*

19      On January 31, 2007, Dr. Warren Chin, upon a referral from Dr. Mark Schakel II,

20 conducted his initial evaluation as a treating physician of Hann regarding her back and multiple

21 pain complaints. AR at 326–331. At that time, Hann reported "intermittent occasional radicular

22 symptoms to her right lower extremity of pain, numbness, and tingling radiating to the foot." AR

23 at 327. She reported that on rare occasions, she noticed "weakness or heaviness in her right lower

24 extremity." *Id.* She also reported that she noted some cramping in her lower extremities, usually at

25 night. *Id.* She described her low back pain as "constant and mild in severity, although becoming

26 moderate to severe with prolonged or repetitive upright activities, including bending, twisting, or

27 stooping." AR at 326. Hann reported that she often had to change positions when lying in bed at

28 night because it was difficult for her to remain comfortable in one position for very long, and she

United States District Court
Northern District of California

2

1  woke at least four times a night. *Id.*

2       At the time of her initial evaluation, Hann was receiving Neurontin for occipital neuralgia.

3  AR at 327. She also relied on Aleve or Advil for her pain. *Id.* She used Flexeril at time, but it only

4  helped a little bit. *Id.* She also received Nexium for gastroesophageal reflux disease and took

5  Imitrex for her migraine headaches. *See id.* She noted that using an ice pack benefited her back

6  pain. AR at 326.

7       As to the history of her pain, Hann reported that her chronic low back pain had been

8  occurring since 2003, beginning several months after she started working for a company called

9  Yardbirds, in which she did a lot of bending and lifting. AR at 326. She reported that she had

10  noticed some slight chronic intermittent back pain, but one morning she woke and could barely get

11  up because of her back pain, and she went to the emergency room. *Id.* She was prescribed muscle

12  relaxant medications, which helped her somewhat. *Id.* By the time of Dr. Chin's initial evaluation,

13  Hann was not working. AR at 328. She stated that the last job she held was as a sales associate at

14  Kohl's, which involved heavy lifting of bundles of clothes. *Id.* She worked there from October

15  2005 to April 2006, but she stopped working because of her back pain. *Id.*

16       Hann also reported that she was in a motor vehicle accident in February 2004. AR at 326.

17  After the accident, she was hospitalized and reported significantly increased back pain, with some

18  radicular symptoms to her right lower extremity. *Id.* At the time of Dr. Chin's initial evaluation,

19  she noted that the radicular symptoms had since improved, but still occurred occasionally. *Id.* She

20  stated that she had stopped driving after the accident because of anxiety about driving. *Id.* She also

21  reported that she had gained approximately fifty pounds in the previous two years. AR at 327.

22       Dr. Chin's initial evaluation included a review of Hann's existing medical records. He

23  noted the following:

24      • A July 9, 2004 x-ray of the lumbar spine was normal. AR at 328.

25      • A December 14, 2005 x-ray of the cervical spine revealed "very mild degenerative

26        changes" and a "slight reversal of the normal lordosis of the lower cervical spine,"

27        but was "otherwise unremarkable." *Id.*

28      • On July 7, 2006, Hann received a free evaluation from a chiropractor, Richard

United States District Court
Northern District of California

1    Forzon, who took several x-rays. AR at 327. The x-ray of the lumbar spine revealed

2    "slight dextroscoliosis of the lumbar spine" and "slight degenerative changes." AR

3    at 328. The chiropractor wished to perform manipulation on Hann, but she could

4    not afford to pay for the treatment. AR at 327.

5    • During 2006, Hann visited physical therapy twice, but she had difficulty attending

6    because she was working at the time. *Id.* Hann stated that the electrical stimulation

7    she received during physical therapy seemed to benefit her.[2] *Id.*

8    • On October 30, 2006, Dr. Schakel concluded that Hann had bilateral plantar

9    fasciitis. AR at 328. Dr. Schakel's treatment of Hann's feet is discussed in more

10   detail below. *See* Part II.B.2., *infra*.

11   • Dr. Chin also obtained AP, lateral, flexion, extension, and oblique views of the

12   lumbar spine. AR at 329. He noted "[m]ild degenerative changes throughout the

13   lumbar spine, with disc space narrowing and some anterior osteophytosis," and

14   "slight dextroscoloiosis of the lumbar spine." *Id.* He stated that no spondylolisthesis

15   or fractures were noted. *Id.*

16   Dr. Chin's initial examination also included a physical and neurological examination, in

17   which he observed Hann to be a "well-developed, well-nourished female who was alert and

18   oriented to person, place, time, and situation" who was not in any "acute distress" and

19   "ambulate[d] with a minimally antalgic gait." *Id.* Dr. Chin noted that "[t]here was no tenderness to

20   palpation in the thoracic spine or bilateral thoracic paraspinal regions." *Id.* However, there was

21   "tenderness to palpation noted in the right lower lumbar spine extending into the right buttock,"

22   and "tenderness noted in the lower lumbar spine extending into the sacrum." *Id.* Dr. Chin found

23   that Hann's range of motion was below average in terms of fingers to the floor distance, flexion,

24   and extension. AR at 330. Hann's deep tendon reflexes in her lower extremities were 2+/4 and

25   symmetrical bilaterally. *Id.* Her motor testing in her lower extremities was 5/5 in all major muscle

26   groups. *Id.* Her sensation to light touch and proprioception was grossly intact in the lower

27

28   [2] A physical therapy note dated September 7, 2006 indicates the same. *See* AR at 696. This note
     also indicates that Hann missed five appointments in a row. *Id.*

United States District Court
Northern District of California

1  extremities. *Id.* Hann was able to perform toe walking adequately, but heel walking exacerbated

2  her plantar fasciitis pain. *Id.*

3      Dr. Chin diagnosed Hann with: (1) chronic low back pain, (2) chronic lumbar strain, (3)

4  mild lumbar degenerative disc disease ("DDD"), per limited x-ray, (4) right-sided sciatic pain, (5)

5  possible restless leg syndrome, and (6) pain-related insomnia. *Id.* Dr. Chin prescribed Hann

6  tramadol, and he referred her for magnetic resonance imaging ("MRI") of her lumbar spine. AR at

7  331.

8      The MRI of Hann's lumbar spine was performed on February 8, 2007, and the next day,

9  Dr. Chin noted that it revealed "disc degeneration at L3-4, L4-5, and L5-S1 with asymmetric

10  bulging of the annulus at L5-S1, greater on the left." AR at 323, 335. He also noted symmetric

11  bulging of the annulus at L3-4 and L4-5. *Id.* He did not note any significant disc protrusions. *Id.*

12      *b.  Dr. Chin's examinations from February 2007 to March 2010*

13      During the approximately three years between the initial examination and March 18, 2010,

14  Dr. Chin conducted numerous evaluations of Hann. AR at 278–331, 451–549. The physical

15  evaluations were generally constant in their observations of low back pain that radiated into her

16  right lower extremity. *See id.* Hann's range of motion, reflexes, and motor testing in her lower

17  extremities generally remained the same as before. *See id.* In these evaluations, Dr. Chin

18  diagnosed Hann with: (1) mild lumbar DDD, (2) chronic low back pain, (3) right-sided sciatic

19  pain, (4) rule out right hip pathology, (5) from December 2007 to January 2009, possible restless

20  leg syndrome, (6) starting in March 2009, pain-related depression, and (7) starting in August 2009,

21  left foot fracture. *See id.* At various times, Dr. Chin prescribed Hann with Lyrica, MS Contin,

22  Norco, Percoset, Restoril, Soma, tramadol, valium, and Vicodin. *See id.*

23      During this time period, Dr. Chin referred Hann for x-rays of her bilateral hips and an MRI

24  of her right hip to rule out pathology at that location. AR at 324. The x-rays and MRI were

25  performed on February 20, 2007, and Dr. Chin noted that they were normal. AR at 318, 319, 340.

26  Dr. Chin also referred Hann for a bone scan of the pelvis and lumbar region to rule out possible

27  neoplastic pathology. AR at 319. The bone scan was done on March 27, 2007, and Dr. Chin noted

28  that it showed "some focal mildly increased activity posteriorly on the right side of the lower

United States District Court
Northern District of California

1    lumbar spine at the level of L5, likely related to degenerative changes," but that it was an

2    otherwise negative result. AR at 315, 333.

3          Also during this time period, Dr. Chin requested authorization for a lumbar epidural steroid

4    injection at the L5-S1 level and referred Hann to Dr. Michael Tran. AR at 316. Hann received the

5    epidural injection on May 17, 2007, and she reported to Dr. Chin that she had nearly immediate

6    benefit in her back pain. AR at 313. Dr. Chin referred Hann to Dr. Tran for a second epidural

7    injection, which she had in or around August 16, 2007. AR at 307, 309. After the epidural

8    injections, Hann reported that her pain seemed to be returning gradually but that it was adequately

9    controlled. *See* AR at 301–311. In October 2007, Dr. Chin noted that Hann was not ready to

10   consider a third epidural injection because she wished to pay off some more of her bills first. AR

11   at 305. Dr. Chin noted that Hann's back pain worsened slightly between October 2007 and

12   December 2007, but then it remained relatively unchanged from December 2007 to January 2009.

13   *See* AR at 287–306.

14         Also during this time period, Dr. Chin reported that Hann had stated she was attempting to

15   exercise by walking and riding a bicycle, although she stopped riding a bicycle sometime around

16   July 2008 because it aggravated her back. *See* AR at 287–307.

17         In March 2009, Hann reported to Dr. Chin that she was struggling with depression and that

18   she at times felt hopeless about the future and about what she would be able to do in light of the

19   limitations caused by her chronic pain. AR at 285. Dr. Chin prescribed Cymbalta and Celexa for

20   the depression. *See* AR at 278–286. While Cymbalta seemed to work well, Hann stopped taking it

21   because her insurance would not pay for it. *See* AR at 278–284. Celexa appeared to help

22   somewhat. *See id.* Hann's depression is discussed in more detail below. *See* Part II.B.3., *infra*.

23         In May 2009, Dr. Chin noted that Hann fractured her left foot in two places when she fell,

24   apparently as a result of flu-related dehydration. *Id.* Hann's broken foot is discussed in more detail

25   below. *See* Part II.B.2., *infra*.

26                    c.    *Dr. Chin's 2007 RFC Questionnaire and Dr. DeSouza's 2010*
                           *review*
27

28         On April 19, 2007, Dr. Chin completed a Lumbar Spine Residual Functional Capacity

United States District Court
Northern District of California

Questionnaire ("RFC Questionnaire"). AR 274–275, 734–737. Dr. Chin diagnosed Plaintiff with chronic low back pain, and right side sciatic pain; specifically, he described Hann's pain as chronic moderate-to-severe right-sided low back pain and buttock pain, radiating to the right lower extremity. AR at 274, 734. He stated that he found signs of tenderness, muscle spasm, impaired sleep, and a reduced range of flexion/extension motion in her lumbar spine. AR at 274, 734, 735. He reported that Hann might experience drowsiness as a side effect of medications she was taking. AR at 735. Dr. Chin noted that emotional factors "possibly?" contributed to the severity of Hann's symptoms and functional limitations. *Id.*

As to Hann's functional limitations, Dr. Chin stated that as a result of Hann's impairments, she could walk one to two city blocks without rest or severe pain. *Id.* He stated that Hann could sit for an hour without needing to get up, and she could stand for twenty minutes before needing to sit down. AR at 735–736. He stated that in a work day with normal breaks, Hann could sit for at least six hours and stand or walk for less than two hours. AR at 736. He stated that Hann needed a job that permitted shifting positions at will from sitting, standing, or walking. *Id.* Specifically, he indicated that during an eight-hour work day, Hann would need to be able to walk for twenty minutes every hour, and to take unscheduled breaks of unspecified amounts of time. *Id.* He noted that with prolonged sitting, Hann did not have to have her legs elevated. *Id.* He did not give an answer to the question as to whether Hann would need a cane or other assistive device for standing/walking. *Id.* He reported that Hann could carry less than ten pounds occasionally, ten pounds rarely, and twenty or more pounds never.[3] AR at 275, 737. He further reported that Hann could twist, stoop (bend), crouch/squat, climb ladders, and climb stairs rarely, and had significant limitations reaching. *Id.*

Dr. Chin opined that Hann's pain or other symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks occasionally. AR at 735. He reported that Hann's impairments were likely to produce "good days" and "bad days,"

---

[3] The RFC Questionnaire defined "rarely" as 1 percent to 5 percent of an 8-hour working day, "occasionally" as 6 percent to 33 percent of an 8-hour working day, and "frequently" as 34 percent to 66 percent of an 8-hour working day. AR at 735.

United States District Court
Northern District of California

1    and that she would likely to be absent from work more than four days per month as a result of her

2    impairments or treatments. *Id.* He stated that the symptoms and limitations described in the RFC

3    Questionnaire dated back to 2003, and they could be expected to last at least twelve months. AR at

4    275, 735, 737.

5         On February 2, 2010, Dr. L. Desouza, a state examining physician, reviewed Dr. Chin's

6    RFC Questionnaire and found that it was "too restrictive" and did not correlate with MRI findings

7    dated February 8, 2007, in which Dr. Chin had noted some disc degeneration, asymmetric bulging

8    of the annulus, and no significant disc protrusions. AR at 323, 335, 425. Dr. Desouza had

9    previously concluded based on his review of the record on January 25, 2010 that Hann was

10   capable of light work with postural limitations. *Id.*

          d.    *Dr. Pang's examinations in 2010 and 2011*

11

12        On June 30, 2010, chronic pain specialist Dr. Norman Pang, by referral from Dr. Chin,

13   evaluated Hann. AR at 726. Hann described deep, sharp, burning, and stabbing pain that was

14   exacerbated by getting out of bed, sitting, twisting, long car rides, bending backwards, exercising,

15   standing continuously, lying on her back or side, lifting, going up or down stairs, and running. AR

16   at 727. She stated that her pain ranged from 4 to 6.5 on a scale of 1 to 10. AR at 726. She stated

17   that because of her pain, she could not perform housework, laundry, or dishes. *Id.* She stated that

18   sitting, standing, or walking for long periods of time was very difficult. *Id.* She stated that she did

19   not sleep soundly and that she took sleep medications. *Id.* As to her mental health, she reported

20   that she was anxious, worried, depressed, hopeless, and frustrated. *Id.* at 727. She admitted to

21   occasional alcohol and marijuana use in the past. AR at 728.

22        In reviewing her medical record, Dr. Pang noted that Hann had never had any pain

23   surgeries. *Id.* Hann stated that helpful nonsurgical treatments included pool aqua therapy and pain

24   medications. *Id.* She stated that the two epidural injections by Dr. Tran did not provide relief. AR

25   at 728, 731. Dr. Pang noted that she seemed to have "done very well" under Dr. Chin's care, and

26   he did not see the need to make any changes to her treatment, nor did Hann. AR at 731.

27        Upon a general review of Hann's health and a physical examination, Dr. Pang found that

28   Hann's spine was positive for back injury and pain, and that she was positive for depression and

United States District Court
Northern District of California

8

anxiety/panic. *Id.* He noted that Hann's extremities had a normal range of motion at the hips, knees, and ankles, and that they were stable and non-tender to palpation. AR at 730. He found that her spine had slightly decreased range of motion to flexion, extension and lateral movement secondary to pain. *Id.* He noted that her motor strength was 5/5 in her extremities. *Id.* He noted that Hann's gait was an abnormal tandem walk and slightly antalgic. *Id.* Dr. Pang gave the following diagnosis: (1) lumbar DDD, (2) ongoing low back pain, (3) history of right lumbar radiculopathy, (4) right hip pain, (5) history of foot fractures, (6) history of probable myofascial spasm and pain, and (7) history of possible reactive depression. AR at 731.

As to future treatment, Dr. Pang noted that he and Hann discussed a variety of issues, including surgery, injections, physical therapy, exercise, and medications. AR at 731–733. Finding that no major changes to her treatment were needed, Dr. Pang recommended exercise in the form of brisk walking, and he also made some changes to her prescriptions. *Id.*

Dr. Pang examined Hann several times after the initial examination until at least date of the hearing in May 2011. *See* AR at 707–725. During this time, Hann indicated some increase in pain. *See id.* Dr. Pang and Hann discussed alternatives to opioid therapy, such as physical therapy, epidural injections, and cognitive behavior therapy, but Hann consistently declined to pursue such options because of her lack of funds. *See id.*

### 2.    Broken foot: Dr. Schakel and Dr. Chin's evaluations

In 2006, Dr. Schakel evaluated Hann for bilateral heel pain and found that she had classic symptoms of plantar fasciitis. AR at 621. He instructed Hann to undergo a gentle Achilles tendon stretching program and suggested orthotics. AR at 622. Orthotics and stretching appeared to help her symptoms to some extent, but her pain persisted. AR at 620.

On July 24, 2009, Dr. Schakel examined Hann in connection with her broken foot, which occurred when Hann fainted and fell on May 2, 2009. AR at 618. Dr. Schakel observed that recently taken x-rays revealed persistent fractures of the bases of the second, third, and fourth metatarsals, but displacement appeared to be minimal.[4] *Id.* He noted Hann had been given a

---

[4] Although Dr. Schakel did not indicate the dates of the x-rays, he appears to have been referring to x-rays taken on July 9, 2009. *See* AR at 378 (x-ray report indicating "persistent ununited

removable boot and postoperative shoe. *Id.* He advised her to immobilize the foot at all times, including when she was in the house. AR at 619. He reported that Hann was taking Celexa, MS Contin, Restoril, Soma, and Vicodin, but that these were not helping much with her pain. AR at 618.

On August 3, 2009, Dr. Chin noted that Hann was apparently not aware that she needed to be wearing her boot both within and without the house. AR at 597. He noted that it was important for her to immobilize the boot as much as possible to allow for adequate healing. *Id.* On August 12, 2009, Dr. Schakel reviewed more recent x-rays of Hann's left foot, and he noted progress in the healing. AR at 616. He also noted that her reported increase in pain might be due to her increase in activity. *Id.*

On February 26, 2010, Dr. Schakel reviewed x-rays of Hann's foot taken on January 8, 2010, and he noted that the fractures appeared to be healed. AR at 421, 614. He noted that Hann reported persistent and apparently worsening pain. AR at 614. Dr. Schakel fitted Hann with a postoperative shoe to immobilize the area. AR at 615.

### 3.   Depression: Dr. Gonick-Hallows and Dr. Paxton's evaluations

On October 19, 2009, Dr. Jonathan Gonick-Hallows, a consultative psychologist, performed a psychological evaluation of Hann. AR at 403–405. On her intake form, Hann described her disability as "Depression. Lower back problems since 2004." AR at 403. During the evaluation, Hann told Dr. Gonick-Hallows that she was depressed, she had no energy, her back hurt badly, and she had to stand up periodically. *Id.* She stated that she felt depressed partly because she had always worked but now could not do so. *Id.* Dr. Gonick-Hallows noted that Hann apparently was prescribed multiple narcotic, anti-anxiety, and antidepressant medications. *Id.*

Regarding her history, Dr. Gonick-Hallows noted that Hann had apparently never been treated for mental health problems and no such records were available for review. *Id.* Hann stated that she had a history of childhood anxiety. *Id.* She explained that her parents divorced when she

---

fractures with proximal metaphysis of the second, third and fourth metatarsals"). X-rays were also taken closer to the date of Hann's fall on May 6, 2009 and May 18, 2009; the latter, when compared to the former, revealed no positional change or significant displacement. *See* AR at 379.

10

United States District Court
Northern District of California

1    was five, she had a wonderful stepfather, and her younger brother committed suicide when he was

2    seventeen. *Id.* She stated that she started working by age sixteen, as a checker at Safeway. *Id.* She

3    stated that she entered into a relationship around age twenty with her current husband, with whom

4    she had a son. *Id.* She stated that he introduced her to drugs, primarily methamphetamine, but he

5    had been clean and sober for seven years. *Id.* She admitted that she continued to drink some and

6    use amphetamine when she was looking "for an energy boost." AR at 403–404.

7        Regarding her work experience, Hann told Dr. Gonick-Hallows that she worked most

8    recently at a department store in 2005, and that her best job was operating a glass mill machine at

9    an optical coatings company. AR at 403–404. She stated that she did very well at this job, but that

10   she was a temporary worker and was let go after two years when the position expired. AR at 404.

11   She stated that she believed she injured her back while working at a big box hardware store some

12   years ago. AR at 404.

13       Regarding her current activities, Hann stated that she was unable to sit for long periods of

14   time and that she could walk, but then she would have to lie down and watch television. *Id.* She

15   said that she did not get any exercise and that she was very easily injured. *Id.* She stated that she

16   was somewhat homebound because she lost her driver's license after a driving under the influence

17   ("DUI") incident in 2004. *Id.*

18       Dr. Gonick-Hallows concluded that Hann was average in her short-term memory for

19   numbers, abstract reasoning in the verbal realm, vocabulary and syntax, and ability to do

20   arithmetic calculations. *Id.* He concluded that Hann had average to mildly below average ability in

21   abstract reasoning in the visual realm. *Id.* He noted that Hann's speech was mostly clear and to the

22   point, but that her judgment and insight were compromised. *Id.* He noted that her thought process

23   was somewhat ruminative, and she did not appear to be impulsive or emotionally disinhibited. *Id.*

24   He stated that her mood was dysthymic with a consistent affective expression. *Id.* He observed no

25   real episodes of emotional deterioration from her dysthymic state and no evidence of thought or

26   psychotic disorder. *Id.*

27       As part of the evaluation, several tests were administered. *Id.* Dr. Gonick-Hallows reported

28   that Hann put forth adequate effort during the testing session and that she listened to instructions

11

and appeared to understand them. *Id.* He reported that she worked a bit slowly and somewhat

impulsively at times. *Id.* He reported that her full-scale I.Q. score was 90, at the low end of the

average range, but that the overall pattern of scatter suggested that her potential may lie more

solidly in the average range. *Id.* He noted that two of Hann's test results suffered from some

inattention. *Id.* He observed no consistent deficits in fine motor ability, visual or perceptual ability,

or executive functions. *Id.* He estimated Hann's Global Assessment of Functioning ("GAF") at 62,

which is consistent with a patient with mild symptoms. *Id. See Ledesma v. Astrue*, C 10-5260

EDL, 2012 WL 424415, at *3 n.1 (N.D. Cal. Feb. 9, 2012) (quoting *American Psychiatric Ass'n,*

*Diagnostic & Statistical Manual of Mental Disorders*, at 34 (4th ed. 2000, Text Revision) ("DSM-

IV")) ("A GAF of 61–70 indicates a patient with '[s]ome mild symptoms . . . OR some difficulty

in social, occupational, or school functioning . . . but generally functioning pretty well, has some

meaningful interpersonal relationships.'").[5]

        Dr. Gonick-Hallows diagnosed Hann with mixed anxiety/depressive disorder with

dysthymia, social anxiety, and low self-esteem. AR at 405. He also diagnosed her with mixed

substance abuse, which was improving according to Hann. *Id.* Dr. Gonick-Hallows opined that

> [Hann] appears to be a person who might have moderate deficits in
> terms of her ability to interact effectively with co-workers,
> supervisors and the general public in either cooperative or
> competitive settings. Cognitively, she seems able to understand and
> carry out simple one and two-part instructions, [and] worked at logic
> problems of average complexity in the verbal and visual realms.
> However, she worked a bit slowly, and might need some additional
> or special supervision if she were expected to learn and carry out
> novel tasks in typical work settings at this point. She might have
> moderate difficulty managing the usual work-related stresses from a
> mental health standpoint.

*Id.* Dr. Gonick-Hallows deferred to medical opinion as to whether Hann could be expected to

work at cognitive tasks over the course of a typical workday in light of her reported chronic pain

---

[5] Dr. Gonick-Hallows reported Hann's GAF of 62 as "Axis V" of his diagnostic impression. AR at
405. Axis V measures GAF. *See* DSM-IV at 32–34; *Nguyen v. Astrue*, C-10-4807 JCS, 2012 WL
2119151, at *20 (N.D. Cal. June 11, 2012) (N.D. Cal. 2012) ("The DSM-IV states that Axis V . . .
is 'for reporting the clinician's judgment of the individual's overall level of functioning.'").

and back injury. *Id.*

On November 23, 2009, Dr. R. Paxton, a state examining physician, completed a Mental Residual Functional Capacity Assessment of Hann based on evidence in her file. AR at 406–408. He found that Hann was not significantly limited as to her abilities to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule and maintain regular attendance, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted, to make simple work-related decisions, to compete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to respond appropriately to changes in the work setting, to be aware of normal hazards, to travel in unfamiliar places, and to set realistic goals. AR at 406–407. Dr. Paxton found that Hann was moderately limited as to her abilities to understand, remember, and carry out detailed instructions, and to ask simple questions or request assistance. *Id.*

### C.      Relevant Testimony

#### 1.      Hann's testimony

At the hearing on April 29, 2011, Hann testified that her only years of significant earnings were in 1999 and 2000, when she worked as an optical coating technician.[6] AR at 32. She testified that she began having lower back pain sometime before 2004, and that one day in 2006 it was so bad that she could not get out of bed and she went to the emergency room. AR at 33.

As to her pain, she testified that her current low back pain was much worse than the back pain that existed when she quit her job in 2006, with a pain level of 6 out of 10 without her medication, and 4 out of 10 with her medication. AR at 33, 35. She testified that the pain in her

---

[6] The transcript says "coding," but this appears to be a typographical error, given the rest of the record. *See, e.g.*, AR at 404.

United States District Court
Northern District of California

right leg was a 3 or 4 out of 10 with medication. AR at 39. She testified that the pain in her left foot, which she broke in May 2009, was aggravated by wearing shoes. *Id.* She testified that she had trouble sleeping and she took medication for it. AR at 44. She testified that she took several medications for the pain in her back and Imitrex for migraines, but she had not had a migraine in the past couple months. AR at 48.

She testified that Dr. Pang recommended epidural injections, but her two previous injections helped only for a month or so. AR at 41. She testified that she did not have enough money to pay for this procedure. AR at 39–41. She testified that Dr. Pang recommended walking, and she testified that she did take short walks, about a block in one direction and a block home. AR at 42. She testified that she has never had surgery on her low back. AR at 47.

As to her depression, she testified to feeling depressed because she had no energy and because she could no longer do the activities that she used to be able to do. AR at 45. She testified that she was not currently seeing anyone for her depression, and that no one had ever recommended treatment for depression to her. AR at 43. She testified that it was hard for her to get to a doctor's office because she had stopped driving after a car accident in 2004 and would need to take a DUI class to reinstate her license. AR at 43, 48.

She testified that she spent most days lying on her side and watching television. AR at 36–37. She testified that she took her six-pound dog on short walks about three times a day, and that she could lift him and carry him down the steps. AR at 37, 47. She testified that she could lift a case of water or soda to put it into the refrigerator. AR at 47. She testified that she took showers once a week and prepared meals, usually by microwaving frozen meals. AR at 45. During the hearing, she stood for her testimony, and she explained that she could only sit for about twenty minutes at a time. AR at 37.

Hann's testimony at the hearing was basically consistent with a Function Report that Hann had filled out on July 28, 2009. AR 212–219.

### 2.   Vocational Expert's testimony

At the hearing, Lynn Berkley, a Vocational Expert ("VE"), testified that Hann's previous work as an optical technician had a light exertional level and a Specific Vocational Preparation

14

("SVP") of 7. AR at 51. The VE testified that the optical technician job did not have any transferable skills to sedentary work. *Id.* She further testified that the optical technician job could not be performed by a hypothetical person of Hann's age, education, and work background with the following limitations:

> lifting and carrying 20 pounds occasionally and 10 frequently; sitting, standing, walking six hours each in an eight-hour day; no climbing of ladders, ropes, or scaffolds; occasional stooping and frequent climbing of ramps and stairs; frequent balancing, kneeling, crouching, and crawling; no work around heights or operating any machinery; limited to one or two-step, simple instruction jobs with occasional contact with public and coworkers.

AR at 51.

The VE testified that the hypothetical person would not be able to perform the optical technician job because that was a skilled job. AR at 51–52. However, the VE testified that the hypothetical person would be able to perform the jobs of a mail clerk or a garment sorter, as defined in the Department of Labor's Dictionary of Occupational Titles ("DOT"). AR at 52.

The VE further testified that the hypothetical person with the additional limitation of only being able to stand for two hours out of eight—corresponding with the ALJ's ultimate determination of Hann's Residual Functional Capacity, *see* Part III.B., *infra*—would be able to perform the job of a small parts assembler, DOT 739.687-030, an unskilled job with an SVP of 2, light exertional level, and a sit/stand option. AR at 52–53. The VE testified that there were approximately 280,000 of these jobs in the national economy and 2,000 in the San Francisco metropolitan area. AR at 53. The VE also testified that this hypothetical person would be able to perform the job of a small products assembler, DOT 706.684.022, an unskilled job with an SVP of 2, light exertional level, and a sit/stand option. *Id.* The VE testified that there were approximately 250,000 of these jobs in the national economy and 2,400 in the San Francisco metropolitan area. *Id.*

The VE further testified that the hypothetical person with the additional limitation of needing to be absent from work more than four times a month would not be able to perform any jobs. *Id.*

During the hearing, Hann's attorney asked the VE whether the small parts assembler and small products assembler jobs identified by the VE would actually have a sit/stand option. AR at 56. The VE testified that her incorporation of the sit/stand option was based on her professional experience doing job analyses and being out on work sites. *Id.* She testified that a common practice in such settings involves the employee sitting at a high stool, and the employee could "pop off[] . . . [and] on . . . as needed." *Id.* The VE also testified that she had selected these jobs over other jobs because they involved limited interactions with co-workers. AR at 55.

### 3.    Christine Baines' testimony

On August 7, 2009, Christine Baines ("Baines"), a friend and part-time in-home care worker for Hann, filled out a Third-Party Function Report. AR at 221–228. Baines stated that she did housework for Hann, and Hann's husband paid her for this work. AR at 221, 228.

Baines stated that Hann's pain and muscle cramps affected Hann's sleep. AR at 222. She stated that Hann was depressed. AR at 226. She stated that Hann could walk for one and a half blocks before needing to rest for five minutes. *Id.* She stated that Hann was afraid of falling and furthering her injury. AR at 227. She stated that Hann was unable to drive, do laundry, do house cleaning, or cook. AR at 222. She stated that Hann was able to care for the household cat by feeding her and sometimes taking care of the litter box. *Id.* She stated that Hann could fold laundry with breaks. AR at 223. She stated that Hann would go down the block to visit Baines at her house a few times per week. AR at 225.

By checking boxes on the form, Baines indicated that Hann's conditions affected her ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, reach, or complete tasks. AR at 226. However, Baines did not indicate that Hann's conditions affected her ability to concentrate, understand, follow instructions, or get along with others. *Id.* She indicated that Hann finished the tasks that she started. *Id.*

## III.    ALJ PROCEEDINGS

### A.    Five-Step Analysis

A claimant is eligible for disability benefits under the SSA if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

United States District Court
Northern District of California

impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). *See also* 42 U.S.C. § 423(a)(1). But the claimant is only disabled if his physical or mental impairments are of such severity that he cannot do his previous work and "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner established a sequential five-step evaluation process to determine whether a claimant meets this definition. 20 C.F.R. § 404.1520(a). If the Commissioner concludes that the claimant is or is not disabled at one of the steps, the Commissioner does not proceed to the next step. *Id.* § 404.1520(a)(4). Otherwise, the evaluation proceeds to the next step. The claimant bears the burden of proving Steps One through Four. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). At Step Five, the burden shifts to the Commissioner to prove that the claimant can perform other work. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the Commissioner considers the claimant's work history. 20 C.F.R. § 404.1520(a)(I). If the claimant is doing "substantially gainful activity," the claimant is not disabled. *Id.* If not, then the evaluation proceeds to Step Two. *Id.*

At Step Two, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of such impairments that has lasted or is expected to last more than 12 months. *Id.* § 404.1520(a)(ii). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling ("SSR") 85-28. If medical evidence does not clearly establish such a finding that would support denial, the evaluation proceeds to the next step. *Id.*

At Step Three, the Commissioner compares the claimant's impairment or impairments with a list of impairments that the Commissioner has determined are disabling ("Appendix 1"). 20

17

C.F.R. § 404.1520(a)(iii). If the impairment—or impairments—"meets or equals" an item on the list in terms of severity and meets the duration requirement, the claimant is disabled. *Id.* Otherwise, the Commissioner proceeds to Step Four. *Id.*

At Step Four, the Commissioner considers the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is the most the claimant can do in light of the physical and/or mental limitations caused by the impairment(s). *Id.* § 404.1545. If the claimant can perform his past relevant work, he is not disabled. *Id.* Past relevant work is work that the claimant has done in the fifteen months prior to the evaluation and was substantial gainful activity that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(I). If the claimant cannot perform his past relevant work, the evaluation proceeds to Step Five. *Id.* § 404.1545.

At Step Five, the Commissioner considers whether the claimant, in light of his RFC, age, education, and work experience, can make an adjustment to "other work" in the national economy. *Id.* § 404.1520(a)(v). If the claimant can make an adjustment to other work, he is not disabled. *Id.* If he cannot, he is disabled and eligible for disability benefits. *Id.*

## B.    ALJ's Findings

On April 29, 2011, the ALJ held a hearing in which Hann testified and was represented by counsel. *See* AR at 29–30. On May 26, 2011, the ALJ issued her decision denying Hann benefits. AR at 8–26.

At Step One, the ALJ found that Hann had not engaged in substantial gainful activity since April 28, 2006, the alleged onset date. AR at 13.

At Step Two, the ALJ found that Hann had the following severe impairments: back pain, right leg pain, left foot fracture, obesity, and anxiety disorder. AR at 13. The ALJ explained that these impairments were "severe" because the affected Hann "more than minimally." *Id.* The ALJ did not include migraine headaches in the list of severe impairments because Hann had testified that she had not had a headache for a few months prior to the hearing. AR at 13–14.

At Step Three, the ALJ found that Hann did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

1    Subpart P, Appendix I. AR at 14. As to obesity, the ALJ explained that although obesity has been

2    considered a severe impairment in other cases, it did not, in this case, result in a finding that it by

3    itself or in combination with other impairments met the requirements of a listing.[7] *Id.* The ALJ

4    noted that she gave "generous[]" consideration to Hann's weight in the functional limitations

5    evaluation. *Id.* As to mental impairment, the ALJ considered the "paragraph B" criteria of the

6    psychiatric review technique. *Id.* (citing 20 C.F.R. § 404.1520a(e)(2)). The ALJ found that Hann's

7    limitations—mild restrictions in activities of daily living, moderate difficulties in maintaining

8    social functioning, concentration, persistence or pace, and no documented episodes of

9    decompensation of extended duration—did not cause at least two "marked" limitations or one

10   "marked" limitation and "repeated" episodes of decompensation, each of extended duration and,

11   thus, did not meet the "paragraph B" criteria. AR 14–15. Further, the ALJ found that the "C"

12   criteria were not met. AR at 15.

13         At Step Four, the ALJ found that Hann had the RFC to perform less than the full range of

14   light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). Specifically, the ALJ found:

15                 [Hann] can lift and/or carry ten pounds frequently, twenty pounds
                   occasionally; she can sit for six hours out of an eight-hour workday;
16                 she can stand and/or walk for two hours out of an eight-hour
                   workday; she can occasionally stoop; she can frequently climb
17                 ramps and stairs, balance, kneel, crouch, and crawl; she cannot
                   climb ladders, ropes, and scaffolds; she cannot work around heights
18                 or operate machinery; and she is limited to one-to-two step
                   instruction jobs with occasional contact with the public and
19                 coworkers.
20

21   AR at 15. The ALJ explained that this RFC assessment reflected the degree of limitation that she

22   had found in the "paragraph B" analysis at Step Three. *Id.* The ALJ stated that in making this

23   assessment, she had considered all symptoms and the extent to which these symptoms could

24   reasonably be accepted as consistent with the objective medical evidence and other evidence, and

25   she had also considered opinion evidence. *Id.*

26         When determining Hann's RFC, the ALJ applied a two-step process. First, she looked at

27

28   _____
     [7] The ALJ noted that Hann was 5'2'' and 169 pounds. AR at 14.

United States District Court
Northern District of California

1   whether there was an underlying medically determinable physical or mental impairment, *i.e.*, one

2   that could reasonably be expected to produce Hann's pain or other symptoms. AR at 15. Second,

3   she evaluated the intensity, persistence and limiting effects of Hann's symptoms to determine the

4   extent to which they limited her functioning. *Id.* Whenever certain pain or symptom statements

5   were not substantiated by objective medical evidence, the ALJ made findings as to the credibility

6   of such statements based on a consideration of the entire case record. AR at 15–16.

7           Applying this two-step process, the ALJ found that Hann's medically determinable

8   impairments could reasonably be expected to cause the alleged symptoms. AR at 17. However, the

9   ALJ found that some of Hann's statements regarding pain or symptoms were not credible based on

10  a consideration of the entire case record. *See* AR at 17–19.

11          The ALJ stated that she had considered all of the medical records. *Id.* She cited, *inter alia*,

12  Hann's July 9, 2004 x-ray of her lumbar spine,[8] December 14, 2005 x-ray of her cervical spine,

13  February 8, 2007 MRI of her lumbar spine, February 20, 2007 x-ray and MRI of her bilateral hips,

14  March 27, 2007 bone scan of her hips and pelvis, May 6, 2009 x-ray of her left foot, July 9, 2009

15  x-ray of her left foot, and January 8, 2010 x-ray of her left foot. AR at 17–18. The ALJ also cited

16  Hann's visits to Dr. Chin, Dr. Schakel, Dr. Pang, and Dr. Gonick-Hallows. *Id.*

17          The ALJ gave little weight to the RFC Questionnaire filled out by Dr. Chin on April 19,

18  2007. AR at 18–19. The ALJ found that there was no medical basis for Dr. Chin's findings that

19  Hann's symptoms would occasionally interfere with her attention and concentration, and that she

20  would miss more than four days a week of work each month. *Id.* The ALJ explained that she was

21  giving this evidence little weight because there was no medical basis for this finding based on the

22  record. AR at 19. The ALJ pointed out that Dr. Chin's own notes, just two months prior to his

23  filling out the form, stated that Hann's February 8, 2007 MRI showed only mild degeneration. *Id.*

24          The ALJ gave great weight to the opinion of Dr. Gonick-Hallow's psychological

25

26  _____

27  [8] The ALJ's decision indicates that this x-ray was taken on July 8, 2004 but this appears to be a
    typographical error because she cites to an x-ray dated July 9, 2004. *See* AR 17 (citing exhibit at
    AR 336). *See also* AR at 328 (Dr. Chin noting normal results from an x-ray taken on July 9,
28  2004).

United States District Court
Northern District of California

1  examination of Hann. *Id.* The ALJ found that Dr. Gonick-Hallows opinions regarding Hann's

2  abilities—*i.e.*, ability to carry out simple one- and two-part instructions, moderate deficits in terms

3  of ability to interact effectively with co-workers, supervisors, and the public, and moderate

4  difficulty managing usual work-related stresses—were consistent with the record. *Id.*

5      The ALJ gave significant weight to the physical state agency review physicians who

6  opined that Hann was capable of a light exertional level, because she found that these observations

7  were consistent with the record as a whole. *Id.* Similarly, the ALJ gave significant weight to the

8  mental state agency review physicians who opined that Hann had mild psychological limitations.

9  *Id.* The ALJ noted, however, that she had given more weight to the subjective complaints of Hann

10  and to the opinion of Dr. Gonick-Hallows, which revealed moderate mental limitations. *Id.*

11      The ALJ considered Hann's testimony. AR at 16. The ALJ noted that despite Hann's

12  alleged limitations regarding difficulty sitting and standing, and pain with her left foot, Hann stood

13  during the hearing. *Id.* The ALJ also pointed out that Hann acknowledged that she does the dishes,

14  dust mops the floor, and makes the bed on a daily basis. *Id.* The ALJ further noted that she can

15  make herself simple meals and pick up her six-pound dog to carry him outside. *Id.* The ALJ

16  further noted that Hann acknowledged that she is able to perform various activities, such as going

17  outside three times a day, taking walks, going out alone, and spending time with neighbors. *Id.*

18      The ALJ considered the Third-Party Function Report from Baines and found that it was

19  credible only to the extent that the statements were consistent with the conclusion that Hann could

20  do the work described in the ALJ's decision, *e.g.*, walking daily, cleaning the cat's litter box, and

21  doing the laundry. *Id.* The ALJ noted that Baines's statements were not under oath. *Id.* The ALJ

22  further noted that Baines was serving as an in-home supportive services worker who was paid by

23  Hann's husband and, thus, had a financial interest in seeing Hann receive benefits. *Id.* The ALJ

24  further noted that her statements were not supported by the clinical or diagnostic medical evidence

25  in the record. *Id.*

26      The ALJ found that Hann was unable to perform any past relevant work as an optical

27  technician, because that was a skilled job requiring public contact. AR at 19–20.

28      At Step Five, the ALJ found that considering Hann's age (45 years old at the time of the

1    alleged onset date), education (high school), and work experience, there were jobs that existed in

2    significant numbers in the national economy to which Hann was capable of making a successful

3    adjustment. *Id.* In making this determination, the ALJ considered the VE's testimony. AR at 20.

4    The VE testified that an individual with Hann's characteristics would be able to perform

5    occupations such as (1) small parts assembler, DOT 739.687-030, light unskilled, SVP 2, with

6    2,000 jobs in the local economy and 280,000 in the national economy, and (2) small products

7    assembler, DOT 706.684-022, light, unskilled, SVP 2, with 2,400 jobs in the local economy and

8    25,000 in the national economy. *Id.* The ALJ stated in her decision that pursuant to SSR 00-4p, the

9    VE's testimony was consistent with the information contained in the DOT. *Id.*

10        The ALJ concluded that Hann had not been under a disability from April 28, 2006 through

11   the date of the decision. *Id.*

12   **IV.    STANDARD OF REVIEW**

13        When reviewing the Commissioner's decision, the Court takes as conclusive any findings

14   of the Commissioner which are free from legal errors and "supported by substantial evidence." 42

15   U.S.C. § 405(g). Substantial evidence is relevant evidence that a reasonable mind might accept as

16   adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

17   *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence means "more

18   than a mere scintilla" but "less than a preponderance." *Desrosiers v. Sec'y of Health and Human

19   Serv.*, 846 F.2d 573, 576 (9th Cir. 1988) (citations omitted). Even if the Commissioner's findings

20   are supported by substantial evidence, they should be set aside if proper legal standards were not

21   applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th

22   Cir. 1978). In reviewing the record, the Court must consider both the evidence that supports and

23   detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

24   1996). *See also Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). "The ALJ is responsible for

25   determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."

26   *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d

27   747, 750 (9th Cir. 1989)). The Court "must uphold the ALJ's decision where the evidence is

28   susceptible to more than one rational interpretation." *Id.* at 1039–40. However, a reviewing court

United States District Court
Northern District of California

1    must consider the entire record as a whole and may not affirm simply by isolating a "specific

2    quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)

3    (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)).

4    **V.    ANALYSIS**

5          Hann argues that the ALJ's decision should be reversed for three reasons: (1) Hann is

6    unable to perform any of the alternative work identified, in light of her limitation to jobs with one-

7    or two-step instructions; (2) the ALJ failed to articulate specific and legitimate reasons for

8    rejecting the opinions of Dr. Chin, the treating physician; and (3) the ALJ failed to properly

9    evaluate the opinions of Dr. Gonick-Hallows, the psychologist whom the ALJ accorded great

10   weight. Pl.'s Mot. at 3. The Commissioner counters that: (1) the ALJ properly relied on the VE's

11   testimony to conclude that Hann could perform the alternative work identified; (2) the ALJ gave

12   good reasons for rejecting Dr. Chin's medical opinions; and (3) the ALJ properly translated Dr.

13   Gonick-Hallows opinion to craft an appropriate RFC. Def.'s Mot. at 11, 17, 20.

14         For the reasons explained below, the Court finds that the ALJ's decision is supported by

15   substantial evidence and free of reversible legal error. Accordingly, the ALJ's decision finding

16   non-disability and denying benefits is AFFIRMED.

17   **A.    Whether Hann is Able to Perform Work Identified by the ALJ**

18         When an ALJ determines a claimant's RFC, the Social Security Administration ("SSA")

19   requires the ALJ to consider the claimant's exertional (generally physical) or nonexertional

20   (generally mental) limitations. *See* 20 C.F.R. § 416.969a. Relevant here, the ALJ must take into

21   account whether the claimant has "difficulty understanding or remembering detailed instructions,"

22   as opposed to simple instructions, which would constitute a nonexertional limitation. *See* 20

23   C.F.R. § 416.969a(c)(1)(iii).

24         When an ALJ determines that a claimant, in light of her RFC, may perform certain jobs

25   that exist in the national economy, the ALJ takes administrative notice of reliable job information

26   provided in the DOT. *See* 20 C.F.R. § 416.966(d)(1). The DOT lists requirements for various jobs,

27   including the level of mental reasoning required. *See Kellerman v. Astrue*, C 11-4727 PJH, 2012

28   WL 3070781, at *17 (N.D. Cal. July 27, 2012) (citing *Meissl v. Barnhart*, 403 F. Supp. 2d 981,

United States District Court
Northern District of California

982 (C.D. Cal. 2005)). The DOT uses a six-point scale to classify Reasoning Levels required for specific jobs. *Kellerman*, 2012 WL 3070781, at *17 (citing *Meissl*, 403 F. Supp. 2d at 982).

Information from the DOT is usually introduced to an ALJ by a VE. The VE testifies as to whether a person with certain limitations can perform certain jobs listed in the DOT. The ALJ has an affirmative responsibility to ask about any conflict between the VE's testimony and the DOT. SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A Dec. 4, 2000). In the event that a conflict arises between the DOT and a VE's testimony, "[n]either the [DOT] nor the [VE] . . . evidence automatically 'trumps.'" *Kellerman*, 2012 WL 3070781, at *18 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007); SSR 00-4p, at *2). Rather, if conflict arises, the ALJ must ask the VE to give a reasonable explanation for the conflict. *Id.* (citing SSR 00-4p, at *4). "[T]he failure to ask about a conflict is harmless where *there is no conflict*, or where 'the vocational expert . . . provided sufficient support for her conclusion so as to justify any potential conflicts.'" *Kellerman*, 2012 WL 3070781, at *18 (quoting *Eckard v. Astrue*, 2012 WL 669895, at *7 (E.D. Cal. Feb. 29, 2012); *Massachi*, 486 F.3d at 1154 n.19)) (emphasis in original).

Here, the ALJ found that Hann's RFC included a limitation to jobs that involved "one-to-two step instruction[s]." AR at 15. The ALJ then relied on the VE's testimony to find that Hann could perform the small parts assembler and small products assembler jobs. AR at 20. These jobs are classified as Reasoning Level 2, which requires an individual to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *See* DOT 706.684-022, 739.687-030.

Hann argues that her RFC limitation to one- to two-step instructions precludes her from performing any jobs classified above Reasoning Level 1 and, as a result, she cannot perform the jobs identified by the VE, which are classified as Reasoning Level 2. Pl.'s Mot. at 4. Hann also argues that because the VE only identified jobs with Reasoning Level 2, an unexplained conflict exists between the VE's testimony and the DOT, which is reversible error pursuant to SSR 00-4p. *Id.* at 6.

In response, the Commissioner makes three arguments. First, she argues that a limitation to

United States District Court
Northern District of California

24

United States District Court
Northern District of California

one- to two-step instructions does not preclude a person from performing jobs requiring Reasoning Level 2. Def.'s Mot. at 12–13, 14–16. The Commissioner argues that Hann's RFC is consistent with the DOT description of the small parts assembler and small products assembler jobs because they are both SVP 2, *i.e.*, unskilled work. *Id.* at 15. The Commissioner also argues that Hann did not produce any evidence of diminished cognitive or reasoning disability. *Id.* at 15.

Second, the Commissioner argues that although an ALJ is required to ask a VE whether her testimony is in conflict with the DOT pursuant to SSR 00-4p, the failure to ask this question is harmless if "there is no conflict or where the [VE]'s testimony provides sufficient support to justify any potential conflict." *Id.* at 14 (quoting *Massachi*, 486 F.3d at 1154 n.19). The Commissioner concedes that the ALJ did not ask this question during the hearing, but it contends that the error was harmless because there was no actual conflict between the VE's testimony and the DOT. Def.'s Mot. at 14. The Commissioner also argues that the VE provided sufficient justification of any conflict with her testimony that her findings were based on her experience in the field and working with agencies. *Id.*

Third, the Commissioner argues that Hann's attorney did not pose any questions to the VE about DOT Reasoning Levels when he had an opportunity to do so, and that allowing such an argument now would set a "dangerous precedent by allowing counsel to sit on their hands rather than timely object to VE testimony and ask relevant questions at the administrative hearing." *Id.* (citing *Solorzano v. Astrue*, CV 11-369-PJW, 2012 WL 84527, at *6 (C.D. Cal. Jan. 10, 2012)).

The Court agrees with the Commissioner's first and second arguments in part, and it does not address the third argument.[9] For the reasons explained below, a limitation to one- to two-step instructions in an RFC does not, as a matter of law, preclude a claimant from performing jobs

---

[9] The Court rejects the Commissioner's first argument to the extent that it depends on the SVP to show consistency between the DOT and the VE's testimony, because the Commissioner "conflat[es] two separate vocational considerations." *Meissl*, 403 F. Supp. 2d at 982. An SVP gauges "'the amount of lapsed time' it takes for a typical worker to learn the job's duties." *Id.* at 983. In contrast, a Reasoning Level gauges "the minimal ability a worker needs to complete the job's tasks themselves." *Id.* Accordingly, the SVP is inapposite to the analysis of whether the DOT's definition of Reasoning Level 2 is consistent with the VE's testimony regarding jobs that Hann could perform with her RFC limitation to one- to two-step instructions.

1    classified as Reasoning Level 2 in the DOT. The record here contains substantial evidence that

2    Hann can meet the requirements of Reasoning Level 2. Thus, there was no actual conflict between

3    the VE's testimony and the DOT, and the ALJ's failure to ask the VE about a potential conflict

4    was harmless.

5         Courts in the Ninth Circuit have held that RFC limitations to "simple, routine" instructions,

6    as well as "one- to two-step" instructions, can both be consistent with Reasoning Level 2. One of

7    the primary cases on this subject is *Meissl v. Barnhart*. In that case, the ALJ determined that the

8    claimant's RFC limited her to jobs involving "simple tasks performed at a routine pace." *Meissl*,

9    403 F. Supp. 2d at 982. Given this limitation, the ALJ determined based on a VE's testimony that

10   the claimant could perform work as a telephone information clerk or as a stuffer (machine

11   packager), both of which required Reasoning Level 2. *See id.* The claimant appealed the ALJ's

12   decision, arguing that Reasoning Level 2 was not consistent with a limitation to jobs involving

13   "simple tasks performed at a routine pace." *Id.* The court disagreed. *Id.*

14        The *Meissl* court rejected the claimant's argument that the DOT's use of the word

15   "detailed" in the Reasoning Level 2 description translated directly to the SSA's use of the words

16   "detailed instructions" in its regulations regarding how an ALJ should shape a claimant's mental

17   RFC. *See id.* That is, there is no "neat, one-to-one parallel" that exists between the SSA's

18   classifications regarding RFCs and the DOT's definitions of Reasoning Levels. *See id.* While the

19   DOT's six-point scale is "graduated, measured and finely tuned," the SSA offers only two

20   categories: "short and simple" and "detailed or complex" instructions. *Id.* (citing 20 C.F.R.

21   § 416.969a(c)(1)(iii); DOT at 1010–11) (some citations omitted) (internal quotation marks

22   omitted).

23        The court reasoned that taking the claimant's position to its logical conclusion, all jobs

24   with a Reasoning Level 2 or higher would fall into the second "detailed or complex" category of

25   the SSA regulations, and that such a result indicated a "blunderbuss" approach. *Id.* The court also

26   noted that Reasoning Level 2's use of the word "detailed" was qualified by the adjective

27   "uninvolved." *Id.* at 984. Thus, the *Meissl* court held that an RFC limitation to "simple tasks

28   performed at a routine pace" was consistent with jobs requiring Reasoning Level 2, and the court

United States District Court
Northern District of California

26

1   affirmed the ALJ's decision. *Id.* at 985.

2       The *Meissl* decision was followed in *Eckard v. Astrue*. In *Eckard*, the ALJ determined that

3   the claimant's RFC limited her to jobs that involved understanding, remembering, and carrying

4   out "simple one or two step job instructions." *Eckard*, 2012 WL 669895, at *2. Given this

5   limitation, the ALJ determined based on a VE's testimony that the claimant could perform her past

6   work as a stocker, which required Reasoning Level 2. *Id.* at *2, *7. The claimant appealed the

7   ALJ's decision, arguing that Reasoning Level 2 was not consistent with a limitation to jobs

8   involving "one or two step job instructions." *Id.* The court disagreed and, relying on *Meissl*, found

9   that there was no conflict between the VE's testimony and the DOT. *Id.*

10      Both the *Meissl* and *Eckard* decisions were followed by a court in this district in *Kellerman*

11  *v. Astrue*. In *Kellerman*, the ALJ determined that the claimant's RFC limited her to jobs that

12  involved understanding, remembering, and carrying out "simple one or two step job instructions."

13  *Kellerman*, 2012 WL 3070781, at *5. Given this limitation, the ALJ determined based on a VE's

14  testimony that the claimant could perform work as a table worker and electronic goods assembler,

15  both of which required Reasoning Level 2. *Id.* at *6, *17. The claimant appealed the ALJ's

16  decision, arguing that Reasoning Level 2 was not consistent with a limitation to jobs involving

17  "one or two step job instructions." *Id.* The court disagreed and, relying on *Meissl* and *Eckard*,

18  expressly held that there was "no conflict between the DOT's level two reasoning and an RFC

19  limitation to 'simple one or two step instructions,'" and "[a]ny attempt to distinguish the two was

20  . . . without merit." *Id.* (citing *Eckard*, 2012 WL 669895, at *7–*8) (original emphasis removed).

21  *See also O'Connor v. Astrue*, C-09-01508 JCS, 2010 WL 3785433, at *11 (N.D. Cal. Sept. 27,

22  2010) (rejecting argument that claimant's restriction to "simple, repetitive work" and "very basic

23  one and two step job requirements" limited her to positions with Reasoning Level 1 only;

24  collecting cases standing for proposition that limitation to simple, repetitive, or routine tasks are

25  consistent with Reasoning Level 2); *Dugas v. Astrue*, 1:07-CV-605, 2009 WL 1780121, at *6

26  (E.D. Tex. June 22, 2009) ("limitation of 'performing 1–2 step instructions in a simple, routine

27  work environment' does not necessarily preclude ability to perform jobs with reasoning levels of 2

28  or 3").

United States District Court
Northern District of California

1    Following this precedent, the Court rejects Hann's attempt to characterize an RFC's

2    limitation to one- to two-step instructions as a distinct, lower level of reasoning than a limitation to

3    simple, repetitive work. *See* Pl.'s Mot. at 7. Although the Court agrees with Hann's

4    characterization of a one- to two-step limitation as a subset of the SSA regulations' classification

5    of simple, repetitive work, the Court does not agree that it is a subset equivalent only to the DOT's

6    Reasoning Level 1. *See id.*

7    The Court acknowledges that some cases, including cases in the Ninth Circuit, have taken

8    a position similar to Hann's. The primary case is *Grigsby v. Astrue*, cited by Hann, in which the

9    court held that "[t]he restriction to jobs involving no more than two-step instructions is what

10    distinguishes Level 1 reasoning from Level 2 reasoning." *Grigsby v. Astrue*, CV 08-1413 AJW,

11    2010 WL 309013, at *2 (C.D. Cal. Jan. 22, 2010). *See also, e.g.*, *Pound v. Astrue*, EDCV 11-

12    2039-JPR, 2012 WL 4513638, at *4 (C.D. Cal. Oct. 2, 2012) (citing *Grigsby*, holding that

13    "reasoning level two is meant to require an aptitude greater than being limited to carrying out one-

14    or two step instructions"); *Hamlett v. Astrue*, EDCV 11-03818-JEM, 2012 WL 469722, at *4

15    (C.D. Cal. Feb. 14, 2012) (in holding that a one- to two-step limitation was inconsistent with

16    Reasoning Level 3, stating that, according to *Grigsby*, a "limitation of two steps of instruction

17    corresponds to Level 1 reasoning."); *Niemeyer v. Astrue*, EDCV 11-1730-MLG, 2012 WL

18    1885085, at *2 (C.D. Cal. May 23, 2012) (citing *Grigsby*, holding that because of claimant's

19    limitation to one- to two-step instructions, claimant "would ordinarily be precluded from

20    performing jobs with a Level 2 reasoning development.").

21    The crux of the holding *Grigsby* is that there was no basis for "el[]iding the difference"

22    between Reasoning Levels 1 and 2. *Grigsby*, 2010 WL 309013, at *2. That is, the DOT's

23    definition of Reasoning Level 1 expressly includes in its definition a requirement that an

24    individual can "carry out simple one- or two-step instructions." *See id.* at *2. The argument is that

25    because this "one- or two-step" language is included in the DOT's definition of Reasoning Level

26    1, an RFC that includes similar language corresponds only with Reasoning Level 1, and nothing

27    higher. *See* Pl.'s Mot. at 4–5.

28    To the extent that *Grigsby* and the cases that cite it stand for the proposition that a

United States District Court
Northern District of California

28

United States District Court
Northern District of California

limitation to one- to two-step instructions is consistent *only* with Reasoning Level 1, this Court disagrees. The *Grigsby* court and Hann's arguments rely solely on the DOT's definitions to justify their conclusions. The Court finds that the reasoning in *Meissl*, *Eckard*, and *Kellerman* is more persuasive. Those cases, instead of relying on the DOT's definitions alone, explained that there is not "a neat, one-to-one parallel that exists between" the DOT and SSA regulations. *See Meissl*, 403 F. Supp. 2d at 984. For example, as the *Meissl* court explained, while Reasoning Level 2 requires that a worker be able to follow "detailed" instructions, these are limited to instructions that are "uninvolved." *Id.* at 984.

Furthermore, in this case, Hann's one- to two-step limitation in her RFC is not qualified by adjectives such as "simple" or "very basic." In contrast, the definition of Reasoning Level 1 requires a person to carry out only "*simple* one- or two-step instructions." *See Grigsby*, 2010 WL 309013, at *2 (emphasis added). The implication is that different claimants may have varying levels of abilities—some may be able to handle more complicated one- to two-step instructions while others can only handle simpler ones. Thus, the correlation of a one- to two-step limitation in an RFC to Reasoning Level 1 is not exact. *See Meissl*, 403 F. Supp. 2d at 984.

Hann cites to other cases outside of the Ninth Circuit that are not persuasive. *See* Pl.'s Reply at 10 (citing *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010); *Santos v. Astrue*, 709 F. Supp. 2d 207, 212 (S.D.N.Y. 2010)). In *Moore*, the court held that the "simple, routine" limitation did not restrict a claimant to Reasoning Level 1 jobs. *See Moore*, 623 F.3d at 604. In the course of this holding, the court noted—without elaboration or citation—that "the ALJ did not limit 'simple' job instructions to 'simple *one- or two-step* instructions' or otherwise indicate that [the claimant] could perform only occupations at a *DOT* Level 1 reasoning level." *See id.* (emphasis in original). In *Santos*, the court found that the ALJ erred in finding that a claimant with an RFC limitation to "one or two step tasks" could perform Reasoning Level 2 jobs. *Santos*, 709 F. Supp. 2d at 212. The court—without elaboration or citation—stated that limitations to "'simple one or two step tasks' and 'simple instructions,'" were "commensurate with" Reasoning Level 1. *See id.* To the extent that these cases stand for a proposition that a limitation to one- to two-step instructions restricts a claimant to Reasoning Level 1, the Court declines to follow them. Again, the Court

29

finds that the reasoning in *Meissl*, *Eckard*, and *Kellerman* is more persuasive.

Thus, a limitation to one- to two-step instructions does not, as a matter of law, preclude a claimant from all jobs requiring Reasoning Level 2. However, such a limitation does not necessarily mean that, as a matter of law, a claimant can actually perform all jobs requiring Reasoning Level 2. *See Dugas*, 2009 WL 1780121, at *6 ("It is a possibility that *some* jobs requiring reasoning level 2 or higher *may* conflict with plaintiff's specific limitations."). Here, the record supports the ALJ's finding that Hann can perform jobs requiring Reasoning Level 2. According to Dr. Gonick-Hallows' examination, which the ALJ gave great weight, Hann had "average" abstract reasoning in the verbal realm and "average to mildly below average" abstract reasoning in the visual realm. AR at 404. Her vocabulary and syntax were average, and her speech was mostly clear and to the point. *Id.* During the testing session, Hann put forth adequate effort, appeared to understand the instructions, and worked at logic problems of average complexity. *Id.* Her I.Q. was on the low end of average. *Id.* Her GAF score was consistent with a patient who has mild symptoms but is generally functioning well. AR at 405. Such findings constitute substantial evidence of Hann's ability to meet Reasoning Level 2's requirements to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *See* DOT 706.684-022, 739.687-030.

Here, the record shows that Hann is capable of meeting the requirements set forth by Reasoning Level 2. It follows that there was no actual conflict between the ALJ's determination of Hann's RFC limitation to one- to two-step instructions and the VE's testimony that Hann could perform the Reasoning Level 2 jobs of a small parts assembler and a small products assembler. Thus, the ALJ's failure to ask the VE about a potential conflict between her testimony and the DOT was harmless.[10] *See Massachi*, 486 F.3d at 1154 n.19.

---

[10] The Court rejects the Commissioner's argument that the VE sufficiently justified any conflict during the hearing. *See* Def.'s Mot. at 14. Hann is correct that the VE's testimony to which the Commissioner points in service of this argument is irrelevant to the one- to two-step instruction issue. *See* Pl.'s Mot. at 8–9.

United States District Court
Northern District of California

1
2

**B.      Whether the ALJ Articulated Specific and Legitimate Reasons for Rejecting Dr. Chin's RFC Questionnaire**

3          When weighing medical opinions, the greatest weight is normally given to the treating

4   physician "because 'he is employed to cure and has a greater opportunity to know and observe the

5   patient as an individual.'" *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.

6   2004); *Magallanes v. Bowen*, 881 F.2d at 751 (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230

7   (9th Cir. 1987)). If the treating physician's opinion is uncontroverted, the ALJ may only reject it

8   by presenting clear and convincing reasons for doing so. *See Magallanes*, 881 F.2d at 751.

9   However, if the treating physician's opinion is contradicted by the opinion of an examining

10  physician, the ALJ may reject the opinion of a treating physician by "setting forth specific,

11  legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v.*

12  *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (quoting *Magallanes*, 881 F.2d at 751) (internal

13  quotation marks omitted). The ALJ can "meet this burden by setting out a detailed and thorough

14  summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and

15  making findings." *Thomas*, 278 F.3d at 957 (quoting *Magallanes*, 881 F.2d at 751).

16         Here, the ALJ gave little weight to treating physician Dr. Chin's opinions that Hann's

17  symptoms would occasionally interfere with her attention and concentration, and that she would

18  miss more than four days a week of work each month. AR at 18. The ALJ explained:

19                   There is no medical basis for this finding due to [Hann's] conditions
20                   as described herein. Dr. Chin's own notes, just two months before
                     he filled out the form, states that the claimant's MRI showed only
21                   mild degeneration. Therefore, this opinion is given little weight.

22  AR at 19.

23         Hann argues that this explanation does not constitute specific and legitimate reasons for

24  rejecting Dr. Chin's RFC Questionnaire.[11] First, Hann argues that a mere statement that there is no

25  medical basis for a finding is insufficient. Pl.'s Mot. at 9 (citing *Regennitter v. Comm'r of Soc.*

26  *Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999); *Embrey v. Bowen*, 849 F.2d 418 (9th Cir. 1988)).

27  ─────────────────

28  [11] Although Hann's argument refers to Dr. Chin's opinions generally, the Court finds it apparent from the pleadings that the key opinions at issue here are contained in the RFC Questionnaire.

United States District Court
Northern District of California

31

1       Second, Hann argues that the ALJ should have considered the broader context of Dr.

Chin's treatments, rather than focusing only on his notes regarding a particular MRI. Pl.'s Mot. at

9. For example, Hann points out that Dr. Chin prescribed strong narcotic medications such as MS

Contin, which is essentially morphine, just a few days after evaluating the MRI, and that he also

prescribed epidural injections. *See id.* Hann argues that the ALJ, as a lay person, is not qualified to

interpret raw medical data in functional terms. *Id.* at 10 (citing *Padilla v. Astrue*, 541 F. Supp. 2d

1102, 1106 (C.D. Cal. 2008); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Day v.

Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).

       Third, Hann points out that the ALJ accounted for Dr. Chin's opinions regarding lifting,

carrying, sitting, standing, maintaining attention, maintaining concentration, and absenteeism, but

the ALJ did not account for Dr. Chin's other opinions regarding, for example, Hann's need to

walk to alleviate pain symptoms and her need for unscheduled work breaks. Pl.'s Mot. at 10. Hann

argues that if the record contains any medical source statement that the ALJ ultimately chooses not

to adopt, the ALJ must provide good reasons to support that rejection. *Id.* (citing SSR 96-8p).

Hann argues that the *Smolen* test should apply, and that the Court should reverse the ALJ's

decision and award benefits to Hann. Pl.'s Mot. at 11 (citing *Smolen v. Chater*, 80 F.3d 1273,

1292 (9th Cir. 1996)).

       The Commissioner argues that the ALJ gave three specific, legitimate reasons for rejecting

Dr. Chin's opinions. First, the Commissioner points out that the ALJ gave a detailed summary of

the medical evidence showing mild objective findings, which was incorporated by reference to

support her conclusion that Dr. Chin's opinions were inconsistent: "There is no medical basis for

this finding due to [Hann's] conditions as described herein." *See* Def.'s Mot. at 18 (citing AR at

19). Second, the Commissioner argues that the ALJ found that Dr. Chin's opinions were

inconsistent with his own records documenting conservative treatment. *See* Def.'s Mot. at 18. The

Commissioner also notes that although Dr. Chin did prescribe epidural injections, he did not

prescribe the more invasive option of surgery. Def.'s Mot. at 20. Third, the Commissioner argues

that the ALJ found that some of Dr. Chin's opinions were contradicted by Dr. Gonick-Hallows'

opinions. *See* Def.'s Mot. at 18.

1    The Commissioner also responds to Hann's argument that the ALJ is "not qualified to

2    interpret raw medical data" by arguing that the ALJ offered no medical opinion but instead

3    properly observed inconsistencies between Dr. Chin's opinions and the objective medical

4    evidence. Def.'s Mot. at 20 (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)).

5        The Court generally agrees with the Commissioner. As an initial matter, the parties do not

6    appear to dispute that Dr. Chin's RFC Questionnaire was contradicted by the opinions of

7    examining physicians. *See* Pl.'s Mot. at 8–9 (employing "specific and legitimate reasons" standard

8    rather than the "clear and convincing" standard); *Thomas*, 278 F.3d at 957 (quoting *Magallanes*,

9    881 F.2d at 751)). Hann also does not substantively respond to the Commissioner's third argument

10   that Dr. Chin's opinions were contradicted by Dr. Gonick-Hallows' opinions. Applying the proper

11   standard, the Court finds that the ALJ gave specific and legitimate reasons for rejecting Dr. Chin's

12   opinions.

13       The ALJ's explanation that "[t]here is no medical basis for this finding due to [Hann's]

14   conditions *as described herein*" was sufficient to incorporate by reference the preceding two pages

15   of the decision that included summaries of objective and subjective medical evidence. *See* AR at

16   17–18 (emphasis added). Specifically, the ALJ noted that a July 9, 2004 x-ray of Hann's lumbar

17   spine was normal,[12] a December 14, 2005 x-ray of her cervical spine revealed mild degenerative

18   changes, a February 8, 2007 MRI of the lumbar spine revealed mild DDD, a February 20, 2007 x-

19   ray her bilateral hips and pelvis was normal, a February 20, 2007 MRI of her bilateral hips and

20   pelvis was normal, a March 27, 2007 bone scan of her hips and pelvis revealed focal mildly

21   increased activity posteriorly, and the most recent x-ray of her left foot from February 26, 2010

22   revealed that the fractures had healed. *Id.* The ALJ also highlighted certain aspects of Hann's

23   visits to Dr. Chin, Dr. Pang, Dr. Schakel, and Dr. Gonick-Hallows. *Id.* The ALJ found that in light

24   of this objective medical evidence, Dr. Chin's opinions—*i.e.*, Hann could handle sedentary work

25   with a sit/stand option, but she would miss more than four days a week of work each month, and

26   her symptoms would interfere with her attention and concentration occasionally—were not

27

28   _____

[12] The ALJ's decision indicates that this x-ray was taken on July 8, 2004, but it appears that this is a typographical error and should refer instead to July 9, 2004. *See supra*, n.8.

United States District Court
Northern District of California

1  supported by the record.

2      The ALJ's analysis was proper. Immediately preceding her rejection of Dr. Chin's

3  opinions, the ALJ properly "set[] out a detailed and thorough summary of the facts and conflicting

4  clinical evidence." *See* AR 17–18; *Thomas*, 278 F.3d at 957 (quoting *Magallanes*, 881 F.2d at

5  751). She then gave her interpretation of this evidence by stating that this evidence did not support

6  Dr. Chin's opinions. *See* AR at 19. She highlighted the lack of support by pointing out that Dr.

7  Chin's then-recent observations of Hann's February 8, 2007 MRI noted only mild DDD. *See* AR

8  at 19. *See, e.g.*, *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (affirming ALJ decision

9  that rejected treating physician's opinions because, *inter alia*, the treating physician, two months

10  prior to opining that claimant was disabled, had noted that that claimant was not disabled and

11  recommended a conservative course of treatment). The ALJ ultimately found that Hann had "the

12  capacity to do a less than full range of light work, as reflected by the [RFC]." AR at 19.

13      Thus, the ALJ summarized the evidence, interpreted it, and stated her findings, which met

14  her burden to set forth specific, legitimate reasons for rejecting Dr. Chin's opinions. *See Thomas*,

15  278 F.3d at 957 (quoting *Magallanes*, 881 F.2d at 751). Contrary to Hann's contentions, the

16  record shows that the ALJ did more than merely "say that medical opinions are not supported by

17  sufficient objective findings," and she did in fact consider the context of the "clinical picture." *See*

18  Pl.'s Mot. at 9. The ALJ also adequately accounted for the whole of Dr. Chin's opinions by

19  considering them and deciding, based on other evidence in the record, to not give them great

20  weight. *See id.* at 10. Accordingly, the Court finds that the ALJ gave specific, legitimate reasons

21  for rejecting Dr. Chin's opinions based on substantial evidence in the record. *See Thomas*, 278

22  F.3d at 957 (quoting *Magallanes*, 881 F.2d at 751).

23      **C.      Whether the ALJ Properly Evaluated Dr. Gonick-Hallows' Opinions**

24      Hann argues that the ALJ erred because she failed to properly evaluate consultative

25  psychologist Dr. Gonick-Hallows' opinions expressed in the October 19, 2009 psychological

26  evaluation, despite giving these opinions great weight. Pl.'s Mot. at 11.

27          **1.      Limitation regarding interaction with supervisors**

28      Dr. Gonick-Hallows opined that Hann might have moderate deficits in her ability to

34

1   interact with the public, co-workers, and supervisors. AR at 405. Although the ALJ crafted an

2   RFC that contained a limitation regarding Hann's ability to interact with co-workers and the

3   public, Hann argues that the RFC shouls have also included a limitation regarding interaction with

4   supervisors. Pl.'s Mot. at 11; Pl.'s Reply at 13–14. The Commissioner responds that the ALJ

5   properly synthesized Dr. Gonick-Hallows' findings into the RFC. Def.'s Mot. at 21. The

6   Commissioner relies on *Stubbs-Danielson v. Astrue*, which held that an ALJ may "translate"

7   physicians' findings of a claimant's limitations into concrete restrictions in the RFC assessment.

8   539 F.3d 1169, 1173 (9th Cir. 2008). Hann replies that no translation was necessary, because Dr.

9   Gonick-Hallows' finding clearly applied to supervisors, as well as to co-workers and the public.

10  Pl.'s Reply at 13–14. The Commissioner argues that even if the ALJ erred by not including a

11  limitation specifically regarding supervisors, any error would be harmless. *Id.* (citing *Molina v.*

12  *Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)).

13          The Court agrees with Commissioner's last argument. Although the ALJ erred in failing to

14  include a limitation regarding interaction with supervisors in Hann's RFC, any error in this regard

15  was harmless.

16          In *Stubbs-Danielson*, an evaluating physician identified the claimant as moderately or

17  mildly limited in several mental functioning areas, but did not assess whether she could perform

18  work on a sustained basis. *Id.* at 1173. The state agency reviewing psychologist also identified

19  moderate limitations in several mental functioning areas and concluded that the claimant retained

20  the ability to "carry out simple tasks." *Id.* The ALJ denied benefits and, on appeal to the Ninth

21  Circuit, the claimant argued that the ALJ's finding of a limitation to "simple, routine, repetitive"

22  work failed to capture the limitations identified by the evaluating physician. *Id.* at 1172. The Court

23  disagreed, and it concluded that the RFC properly incorporated the identified limitations, because

24          [t]he ALJ translated Stubbs-Danielson's condition . . . into the only
25          concrete restrictions available to him—[the state agency reviewing
            psychologist] recommended restriction to "simple tasks." This does
26          not, as Stubbs-Danielson contends, constitute a rejection of [the
            evaluating physician's] opinion.
27

28  *Stubbs-Danielson*, 539 F.3d at 1174. In other words, an ALJ can properly "translate" opinions

1   from one or more physicians into a limitation in a claimant's RFC.

2        However, where an ALJ has already found a physician's opinions to be credible and

3   concrete, an ALJ can err by omitting aspects of that physician's opinions from the RFC. For

4   example, in *Gentry v. Colvin*, 1:12-CV-01825-SKO, 2013 WL 6185170 (E.D. Cal. Nov. 26,

5   2013), the court found that the ALJ made reversible error where a physician, credited by the ALJ,

6   had opined that the claimant had limitations as to the public, co-workers, and supervisors, but the

7   RFC only included a limitation regarding the public. The court reasoned that "[u]nlike [*Stubbs-

8   Danielson*], a limited ability to interact with supervisors and co-workers is conducive to the

9   formulation of a concrete restriction in the RFC in the same way the ALJ created a restriction in

10  the RFC accounting for [claimant's] limited ability to have contact with the public." *Gentry*, 2013

11  WL 6185170, at *16.

12       The *Gentry* court further distinguished *Stubbs-Danielson* by explaining that in that case,

13  the RFC's limitation for simple, repetitive tasks "bore a logical nexus" to the physician's opinions

14  that the claimant was arguing had been omitted or rejected. *Id.* The *Gentry* court found that, in its

15  case, the Commissioner had failed to identify any limitations in the RFC that bore a "nexus" to, or

16  otherwise captured, the co-worker and supervisor limitations. *See id.* Thus, the court ordered that

17  "[o]n remand, the ALJ must either set forth reasons why this portion of [the physician's] opinion

18  was rejected or include the limitations in claimant's RFC and solicit testimony from a VE

19  regarding whether an individual with such limitations can perform work available in the

20  economy." *Id.*

21       In the instant case, the ALJ gave great weight to Dr. Gonick-Hallows opinions, including

22  his opinion that Hann appeared to have moderate deficits in terms of her ability to interact

23  effectively with the public, co-workers, and supervisors. AR 19, 405. However, the ALJ crafted an

24  RFC that provided a limitation to "occasional contact with the public and co-workers," with no

25  mention of supervisors. *See* AR at 15. Because Dr. Gonick-Hallows' opinion of Hann's limitations

26  applied to all three of these categories of people—and this opinion was concrete, not requiring

27  "translation"—the ALJ should have included it as a limitation in her RFC. *See Gentry*, 2013 WL

28  6185170, at *16.

United States District Court
Northern District of California

1    However, the Court finds that this error is harmless. The Ninth Circuit has explained that

2    the Supreme Court case *Shinseki v. Sanders* "establishes that administrative adjudications are

3    subject to the same harmless error rule as generally applies to civil cases." *Ludwig v. Astrue*, 681

4    F.3d 1047, 1054 (9th Cir. 2012) (citing *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009); *Molina v.*

5    *Astrue*, 674 F.3d 1104, 1118 (9th Cir. 2012); *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir.

6    2011)). "Reversal on account of error is not automatic, but requires a determination of prejudice."

7    *Ludwig*, 681 F.3d at 1054. This determination entails "case-specific application of judgment,

8    based upon examination of the record," not "mandatory presumptions and rigid rules." *Id.* (citing

9    *Shinseki*, 556 U.S. at 407). Specifically,

10
11    > the factors that inform a reviewing court's "harmless-error"
      > determination are various, potentially involving, among other case-
12    > specific factors, an estimation of the likelihood that the result would
      > have been different, an awareness of what body (jury, lower court,
13    > administrative agency) has the authority to reach that result, a
      > consideration of the error's likely effects on the perceived fairness,
14    > integrity, or public reputation of judicial proceedings, and a
      > hesitancy to generalize too broadly about particular kinds of errors
15    > when the specific factual circumstances in which the error arises
      > may well make all the difference.
16

17    *Id.* (citing *Shinseki*, 556 U.S. at 411–12). Although a "claimant need not necessarily show what

18    other evidence might have been obtained had there not been error," she "does have to show at least

19    a 'substantial likelihood of prejudice.'" *Ludwig*, 681 F.3d at 1055 (quoting *McLeod*, 640 F.3d at

20    888). *See also Molina*, 674 F.3d at 1111 (9th Cir. 2012) (quoting *Shinseki*, 556 U.S. at 409 ("[T]he

21    burden of showing that an error is harmful normally falls upon the party attacking the agency's

22    determination."); *Dukellis v. Colvin*, C-12-05534 JSC, 2013 WL 6852040, at *7 (N.D. Cal. Dec.

23    30, 2013) (quoting *Molina*, 674 F.3d at 1111) ("[W]e may not reverse an ALJ's decision on

24    account of an error that is harmless.").

25    Here, although a determination of harmlessness may have some effect on the perceived

26    fairness of the ALJ proceedings, the Court finds that this consideration is outweighed by the fact

27    that the ALJ is unlikely to come to a different conclusion if the case is remanded to correct this

28    one small error. That is, the only possible prejudice is that if the supervisor limitation had been

United States District Court
Northern District of California

1    included, the VE would not have been able to identify *any* alternative jobs existing in significant

2    numbers in the national economy that Hann could perform. However, Hann does not demonstrate

3    a substantial likelihood that this is the case. Hann has not presented a single argument or pointed

4    to any evidence that the VE's answers to the ALJ's hypotheticals might have changed if a

5    supervisor limitation had been included. *Cf. O'Connor*, 2010 WL 3785433, at *11 (ALJ properly

6    relied on VE's testimony that hypothetical person limited to "no more than occasional contact

7    with coworkers, the public, or supervisors" could perform job as bench assembly clerk).

8          Further, as the Commissioner points out, Hann does not make any argument that the jobs

9    identified by the VE would actually entail more than occasional contact with supervisors. *See*

10   Def.'s Mot. at 23. The VE expressly stated she identified jobs where an individual would "have

11   [her] own components" and "work on them on [her] own." AR 55. The VE explained that she had

12   identified the small parts assembler and small products assembler jobs in particular, over other

13   types of assembly jobs, because they involved limited contact with others:

14              And that's what I was looking up . . . to make sure that I wasn't
                giving you something that you were passing down so on in assembly
15              line [sic]. If you put a piece together then the next person put [sic]
                another one then it's a team effort and that would imply frequent
16              contact with coworkers. But if you're doing your own parts then you
                would only have occasional. And that's why I used those two
17              examples.

18

19   *Id.* Additionally, the jobs identified by the VE both have a Worker Function code regarding the

20   jobs' relationship to people of 8, *i.e.*, "Taking Instructions-Helping," which indicates the lowest

21   level of interaction with people that is necessary for jobs listed in the DOT. *See* DOT 706.684-

22   022, 739.687-030; DOT, Parts of the Occupational Definition, 1991 WL 645965 (explaining that

23   middle three digits in a DOT occupational code constitute the Workers Functions code and the

24   second of these digits relates to interaction with people on a scale of 1–8, and "functions which are

25   less complicated have higher numbers."). Level 8, "Taking Instructions-Helping," entails

26   "[a]ttending to the work assignment instructions or orders of supervisor" and "[n]o immediate

27   response required unless clarification of instructions or orders is needed." DOT, Appendix B,

28   Explanation of Data, People, Things, 1991 WL 688701. The next level up, "Serving," which is

United States District Court
Northern District of California

38

1    indicated by a digit 7, requires the more advanced social skills of "[a]ttending to the needs or

2    requests of people or animals or the expressed or implicit wishes of people" and "[i]mmediate

3    response is involved." *Id.*

4          The Court also notes that Dr. Paxton, to whom the ALJ gave significant weight, found that

5    while Hann was moderately limited in her ability to ask simple questions or request assistance, she

6    was not significantly limited in her "ability to accept instructions and respond appropriately to

7    criticism from supervisors." AR at 407.

8          The instant case is distinguishable from *Gentry* on the facts because, in that case, both the

9    co-worker and supervisor limitations were omitted. Here, only the supervisor limitation was

10   omitted. The RFC's limitation regarding co-workers has a "logical nexus" to the limitation

11   regarding supervisors. *See Gentry*, 2013 WL 6185170, at *16. The Court also notes that

12   interactions with the public are generally considered to be more challenging, and to require a

13   higher level of social ability, than interactions with co-workers or supervisors. *See, e.g.*, *Calvillo v.*

14   *Astrue*, CV 12-07558-VBK, 2013 WL 3200508, at *11 (C.D. Cal. June 24, 2013) (proper RFC

15   limited claimant to no contact with the public, and occasional contact with supervisors and co-

16   workers). Here, limitations regarding the public and co-workers were included in the RFC and the

17   hypothetical posed to the VE. The Court concludes that failing to include a limitation regarding

18   the public can sometimes constitute reversible error but, in this case, failing to include a limitation

19   regarding supervisors—particularly where a limitation regarding co-workers is already included—

20   is not reversible error.

21         Thus, the Court finds that the RFC containing a limitation regarding the public and co-

22   workers sufficiently captures Dr. Gonick-Hallows' opinions regarding Hann's social limitations as

23   to the public, co-workers, and supervisors.[13]

24   _____

25   [13] The Court notes that at least one other case in this Circuit has found reversible error in a similar
     circumstance. *See Kehn v. Colvin*, 12-CV-0399-JPH, 2013 WL 6195715, at *9 (E.D. Wash. Nov.
26   27, 2013) (ALJ committed reversible error where physician who was given significant weight
     found that claimant was limited to superficial contact with the public, co-workers, and supervisors,
27   but the RFC only included limitations regarding the public and co-workers). However, the Court
     declines to follow *Kehn* because its analysis of this issue was very limited in light of the fact that
28   the Commissioner did not address the argument. *See id.* ("The [Commissioner] did not address

### 2.   Additional arguments

Hann also argues that the ALJ did not address—and therefore improperly rejected—Dr. Gonick-Hallows' opinions regarding Hann's moderate difficulty in managing the "usual work-related stresses." Pl.'s Mot. at 12. Further, Hann argues that the ALJ's decision did not reflect that she considered the combination of Hann's mental impediments caused by both psychological symptoms and pain symptoms from her physical impairments in assessing the degree of Hann's overall mental capacity for work functioning. *Id.* In response, the Commissioner argues that the ALJ properly synthesized Dr. Gonick-Hallows' opinions into the RFC. Def.'s Mot. at 21.The Commissioner also argues that the ALJ relied upon the state agency reviewing psychiatrist, which shows that the ALJ considered both mental and physical impediments. Def.'s Mot. at 22.

As to these additional arguments, the Court agrees with the Commissioner. Dr. Gonick-Hallows' opinions regarding Hann's difficulty managing work-related stresses were properly translated into the RFC's limitations regarding one- to two-step instructions and occasional contact with the public and co-workers, based on substantial evidence in the record. *See* AR at 15. Further, Hann's assertion that the ALJ did not consider the combination of physical and mental impairments is without elaboration or citation to the record. Indeed, the ALJ's decision summarized and gave varying weights to evidence of Hann's physical and mental limitations. *See* AR at 16–19. For example, at Step Five, the ALJ stated that

> [i]n sum, the claimant's activity level, objective clinical and diagnostic findings, and treatment records support finding that the claimant is not disabled . . . This [RFC] takes into consideration the claimant's subjective complaints while finding the maximum limitations based on the objective evidence.

AR at 19. Accordingly, the Court finds that the ALJ adequately considered Hann's combination of impairments.

## VI.   CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's decision is supported by

---

this issue in briefing and there is no evidence in the record establishing this would not affect the outcome."). Further, the *Kehn* court did not invoke the claimant's general burden to show harm. *See id*; *Molina*, 674 F.3d at 1111 (quoting *Shinseki*, 556 U.S. at 409).

United States District Court
Northern District of California

1  substantial evidence and free of reversible legal error. The Court DENIES Hann's motion for

2  summary judgment, GRANTS the Commissioner's cross-motion for summary judgment, and

3  AFFIRMS the ALJ's decision.

4        **IT IS SO ORDERED**.

5  Dated: March 28, 2014

6  _____

7  JOSEPH C. SPERO
   United States Magistrate Judge

United States District Court
Northern District of California

41